941 F.2d 1181
 MACCABEES MUTUAL LIFE INSURANCE COMPANY, Plaintiff,
v.
Julie Dianne MORTON, Karen Morton Sowell, Larry Lee Morton,
Josephine Morton Roberts, Individually and Admin.
Charles Edward Morton, Deceased, Defendants.
Julie Dianne MORTON, Counter-Claimant,
v.
MACCABEES MUTUAL LIFE INSURANCE COMPANY, Counter-Defendant.
Karen Morton SOWELL, Larry Lee Morton, Counter-Cross-Claimants,
Josephine Morton Roberts, Counter-Cross-Claimant-Appellee,
v.
MACCABEES MUTUAL LIFE INSURANCE COMPANY, Counter-Defendant,
Julie Dianne Morton, Cross-Defendant-Appellant.
 No. 90-8618.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 12, 1991.
 
 Daniel Lee Dean, Christina K. Cooley, Daniel Lee Dean & Associates, Atlanta, Ga., for appellant.
 Robert Edward Casey, Jr., Webb Kicklighter & Casey, Marietta, Ga., for Maccabees.
 Robert Benjamin Hill, McLain & Merritt, Atlanta, Ga., for Roberts.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH, Circuit Judge, and GODBOLD and CLARK, Senior Circuit Judges.
 KRAVITCH, Circuit Judge:
 
 
 1
 This appeal arises out of two consolidated cases in which Julie Dianne Morton, ex-wife of the deceased Charles Morton, attempted to collect the proceeds of an IRA account from Smith Barney, Harris Upham & Co., Inc. and a life insurance policy from Maccabees Mutual Life Insurance Corporation. Although a number of parties were involved at various stages of the suit, the only parties remaining at trial were Dianne Morton (designated as the defendant) and Josephine Morton Roberts, mother of the deceased and administratrix of his estate (designated as the plaintiff). After the district court denied Morton's motion for summary judgment, the case was tried to a jury. At the close of plaintiff's evidence and again at the close of all evidence, Morton moved for a directed verdict. The district court denied both motions, and the jury found in favor of Roberts. The district court denied Morton's alternative motions for judgment notwithstanding the verdict or a new trial. We vacate the order of the district court and remand for a new trial.I. Background
 
 
 2
 Dianne and Charles Morton were married on June 8, 1974. During their marriage, Charles obtained a $100,000 life insurance policy and named Dianne as the beneficiary. In June, 1986, this policy was replaced by a similar policy from Maccabees, which also named Dianne as beneficiary. Charles and Dianne also opened IRA accounts during their marriage and named each other as beneficiaries. Both the IRA accounts and the life insurance policy provided that the owner could change the beneficiary by giving written notice to the company.
 
 
 3
 In 1986, Charles and Dianne decided to divorce, and they signed a separation agreement on September 3, 1986 resolving all property and support disputes between them. The divorce became final in January, 1987.
 
 
 4
 Charles Morton became ill on September 14, 1987 and was hospitalized on September 15, 1987. He remained in the hospital until his death on October 15, 1987. He was incompetent during virtually all his time in the hospital. While Charles was hospitalized, both Dianne Morton and appellee Roberts visited him repeatedly. At trial, Roberts testified that Dianne Morton had made a number of promises at the hospital that if she were a beneficiary on any of her ex-husband's insurance policies, she would take steps to correct that and ensure that any benefits went to the family. Morton denied making such statements. According to Roberts, she relied on these statements and not only paid hospital bills that were not covered by Charles Morton's medical insurance but also did not hire an attorney or pursue any legal action to change the status of the beneficiary on the life insurance policy or the IRA.
 
 
 5
 After Charles's death, Dianne Morton attempted to collect the proceeds of the life insurance policy and the IRA that named her as beneficiary. Roberts claimed that Morton was not entitled to the proceeds. Morton ultimately filed suit. Although a number of other parties were involved in the controversy at various times, Morton and Roberts were the only parties remaining at trial.
 
 
 6
 As administratrix of Charles Morton's estate, Roberts made four arguments at trial as to why Dianne Morton was not entitled to the proceeds of the life insurance policy and the IRA: 1) Dianne Morton assigned to Charles Morton her right to the proceeds in the separation agreement; 2) Dianne Morton made an enforceable promise to Roberts at the hospital to transfer Dianne Morton's rights to Charles Morton's family; 3) Dianne Morton committed fraud and misrepresentation against Roberts by stating that she would take steps to make sure the proceeds were paid to the family; and 4) Dianne Morton expressly waived any rights to the proceeds. After denying Morton's motion for a directed verdict, the court instructed the jury and gave the jury three verdict forms. The jury was to use the first form if it found in favor of Morton. The jury was to use the second form if it found in favor of Roberts on any of the first three theories above. The jury was to use the third form if it found for Roberts on the fourth theory.
 
 
 7
 The jury returned a verdict in favor of Roberts, as administratrix of Charles Morton's estate, on the second verdict form. The form did not require the jury to specify upon which theory it had based its verdict. Upon Morton's motion for judgment notwithstanding the verdict (JNOV), or alternatively, for a new trial, the district court held that all three theories were supported by the law and the evidence, and therefore denied the motions.
 
 II. Standard of Review
 
 8
 In reviewing a district court's decision on a motion for JNOV, our standard is the same as that used by the district court in the first instance. Ortega v. Schramm, 922 F.2d 684, 694 (11th Cir.1991). We have articulated that standard as follows:
 
 
 9
 All of the evidence presented at trial must be considered "in the light and with all reasonable inferences most favorable to the party opposed to the motion." A motion for judgment n.o.v. should be granted only where "reasonable [people] could not arrive at a contrary verdict...." Where substantial conflicting evidence is presented such that reasonable people "in the exercise of impartial judgment might reach different conclusion, [sic]" the motion should be denied.
 
 
 10
 Simon v. Shearson Lehman Bros., Inc., 895 F.2d 1304, 1310 (11th Cir.1990) (quoting Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1558 (11th Cir.1988) (emphasis original)).
 
 
 11
 The verdict form returned by the jury was a general verdict, and we therefore do not know upon which of the three legal theories the jury's decision rested. "Because the jury returned a general verdict, this court must affirm that all three theories were properly submitted to the jury to sustain the court below. Failure of any one mandates a new trial in the district court." Walden v. United States Steel Corp., 759 F.2d 834, 838 (11th Cir.1985); see also Michigan Abrasive Co., Inc. v. Poole, 805 F.2d 1001, 1005 (11th Cir.1986); Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n, 885 F.2d 266, 271 (5th Cir.1989).
 
 III. The Separation Agreement
 
 12
 The first theory upon which the jury could have found for Roberts was that Dianne Morton assigned to her husband all her rights to the proceeds of the IRA and the life insurance policy when she entered into the separation agreement between her and her husband. The separation agreement contained the following provision:
 
 MUTUAL RELEASE OF RIGHTS AND CLAIMS
 
 13
 Except for the rights provided or reserved in this Agreement, the parties for themselves and their respective heirs, personal representatives and assigns, do hereby mutually release, waive, surrender and assign to the other, his or her heirs, personal representatives and assigns, all claims, demands, accounts, powers of attorney and causes of action which either of them may have against the other and they do hereby further mutually release, waive, surrender and assign to the other, his or her heirs, personal representatives and assigns, all the right title, interest and claim which said parties might now have or which they may hereafter have as the husband, wife, widower, widow or next of kin, successor or otherwise, in and to any property, real or personal, that either of said parties may own or may hereafter acquire, or in respect of which either of said parties has or may hereafter have any right, title, claim or interest, direct or indirect, including any rights or dower, community or marital property, statutory thirds, halves or legal shares and widow's or widower's rights, or to participate in any way in the enjoyment of distribution of any of the real or personal estate of which the other may be possessed at the time of his or her death, or any right to receive any legal right or interest whatsoever therein, including the right to administer upon the estate of one so dying.
 
 
 14
 (emphasis added).
 
 
 15
 Although the jury may have found that this provision of the separation agreement was intended to assign to Charles Morton Dianne's rights to the proceeds of the IRA and the life insurance policy, we hold that this issue should not have been submitted to the jury. Our conclusion is based on a recent decision by the Supreme Court of Georgia. In Kruse v. Todd, 260 Ga. 63, 389 S.E.2d 488 (1990), decided after Morton's alternative motions for JNOV or a new trial, the Supreme Court of Georgia addressed a separation agreement very similar to the one in the present case. The Court stated that if an agreement is clear and unambiguous, a reviewing court may not look beyond the document itself to determine the intention of the parties. Id. at 67, 389 S.E.2d at 491. The Court then examined the agreement and found that it could not be interpreted to include a life insurance policy. Here, as in Kruse, the agreement is unambiguous. There is no indication that Charles and Dianne Morton intended to include the IRA and the life insurance policy in the separation agreement.
 
 
 16
 In the first portion of the release provision of the separation agreement, the parties to the agreement expressed their desire to "release, waive, surrender and assign to the other ... all claims, demands, accounts, powers of attorney and causes of action which either of them may have against the other." This statement has no effect on an IRA or insurance policy. IRAs and insurance policies are contracts between the owner and the company issuing the account or policy. In this case, Charles Morton, the owner, had contracts in which Smith Barney and Maccabees agreed to pay proceeds to a beneficiary, Dianne Morton, upon Charles's death. Charles was under no legal or equitable obligation to name Dianne as a beneficiary. Dianne had no right to these proceeds so long as Charles was alive. Moreover, both of these contracts gave Charles the ability to change the named beneficiary any time he wished. He did not do so. When Charles died, Dianne then had claims against Smith Barney and Maccabees. At no time did Dianne ever have a claim against Charles. Therefore, the separation agreement's waiver of claims "against the other" cannot apply to Dianne's rights as a beneficiary. See Kruse, 260 Ga. at 67, 389 S.E.2d at 491.
 
 
 17
 The next portion of the agreement similarly waives any present or future interest in various types of property which either of them might have "as the husband, wife, widower, widow or next of kin, successor or otherwise." This language expresses a clear intention to waive any rights acquired through the marital relationship. Although Roberts contends that the term "otherwise" indicates a broader intention, we conclude that the term's placement next to the other descriptive terms shows a more limited intention to ensure that any claims based on the marital or familial relationship are covered under the agreement. This conclusion is bolstered by the nature of the rights waived in the subsequent language. That language indicates that the rights involved are rights that arise through the parties' union as husband and wife. This is best exemplified by the references to such rights as dower, community property, and participation in the distribution of the estate.
 
 
 18
 Having determined that the rights described are those arising from the marital relationship, we further interpret this portion of the agreement as not expressing an intention to surrender any rights to the IRA or the life insurance policy. Again, our conclusion is based on the nature of IRAs and life insurance policies. As discussed above, Charles Morton was never obligated to designate Dianne Morton as a beneficiary. Furthermore, he was never prevented from removing her as a beneficiary, either before or after their divorce. In short, her status as beneficiary was unrelated to the husband-wife relationship of the parties to the separation agreement. See Kruse, 260 Ga. at 67, 389 S.E.2d at 491 ("Kruse's status as a beneficiary of a life insurance policy was not a claim or right Kruse had 'by reason of' her marriage to Dr. Todd."). We therefore hold that Georgia law did not allow this theory to be submitted to the jury.
 
 IV. Promissory Estoppel
 
 19
 The second ground upon which the jury could have found for Roberts was that Morton made an enforceable promise to Roberts at the hospital that Morton would transfer her rights under any insurance policies to Charles Morton's family. Although Morton testified that she did not make such a promise, the jury was entitled to believe Roberts's testimony that the promises were in fact made and that Roberts relied on them. Our inquiry is therefore limited to determining if the promises were binding.
 
 
 20
 Roberts argues that she relied on Morton's promises to correct the beneficiary on the life insurance policy and therefore did not retain a lawyer, attempt to be appointed guardian, or attempt to change the beneficiary. Georgia law has codified the theory of obligation generally known as promissory estoppel:
 
 
 21
 A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise....
 
 
 22
 Ga.Code Ann. § 13-3-44(a). Morton argues that even if the promises were made, Morton could not have reasonably expected the promises to induce Roberts not to pursue her legal rights. Moreover, Morton contends that even if she reasonably could have expected such forbearance, no injustice occurred. According to Morton, the short time that Charles Morton was hospitalized before he died was insufficient for Roberts to attain a permanent guardianship, and Roberts made no showing that she could have attained an emergency guardianship had she sought one. Morton also states that even if Roberts had been appointed guardian, Roberts made no showing that she could have had the beneficiary changed on the policy. In support of this contention, Morton notes that the insurance policy expressly stated that "[t]he Owner may change any beneficiary...." (emphasis added).
 
 
 23
 Georgia law allows the appointment of an emergency guardian upon a showing of:
 
 
 24
 (1) Such facts as establish an immediate, clear, and substantial risk of death or serious physical injury, illness, or disease unless an emergency guardian is appointed; or
 
 
 25
 (2) Such facts as establish an immediate, substantial risk of irreparable waste or dissipation of the estate of the proposed ward unless an emergency guardian is appointed.
 
 
 26
 Ga.Code Ann. § 29-5-8(b). A Georgia probate judge correctly testified as to this issue of Georgia law. R4-63 ("One of two things has to occur. Either it's preservation of life or preservation of an estate."). The probate judge also testified that an emergency guardian can be appointed within five days under Georgia law. R4-72; see also Ga.Code Ann. § 29-5-8(d)(2). Roberts testified that if she had not relied on Morton's promise, she "would have certainly gotten the lawyer to see if there was a way that we could get the beneficiaries changed over to Charlie's estate or his family." R3-95 (emphasis added). Based on this testimony, a reasonable jury could have concluded that but for Roberts's reliance on Morton's promise, Roberts would have been able to convince a probate judge that immediate, substantial dissipation of Charles Morton's estate would occur if an emergency guardian was not appointed.[1]
 
 
 27
 Morton also contends that even if an emergency guardian had been appointed, an emergency guardian cannot change the beneficiary of a life insurance policy. The probate judge did not express an opinion on this issue. Although Georgia has no precedent on this issue, Roberts cites several cases from other jurisdictions that have held that a guardian, with court approval, may change the beneficiary of a life insurance policy. See, e.g., United States v. Tighe, 229 F.Supp. 680, 686 (S.D.Miss.1964); Murray v. United States, 107 F.Supp. 290, 294 (E.D.Mich.1950), aff'd, 188 F.2d 362 (6th Cir.) (per curiam), cert. denied, Y342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617 (1951). We are satisfied that Roberts met her burden of showing that it was possible that she could have had the beneficiary changed had she not relied on Morton's promise. JNOV or a new trial was therefore not appropriate for the promissory estoppel claim.
 
 V. Fraud and Misrepresentation
 
 28
 The third theory upon which the jury could have found for Roberts was that Morton committed fraud and misrepresentation. In order to show fraud and misrepresentation, Roberts had to show that Morton 1) made a representation; 2) which she knew was false when made; 3) that was made with the intent and purpose to deceive Roberts; 4) upon which Roberts relied; 5) which proximately caused Roberts to suffer a loss. Ekstedt v. Charter Medical Corp., 192 Ga.App. 248, 248, 384 S.E.2d 276, 277 (1989).
 
 
 29
 Morton argues that the second element above, that she knew the statements were false when made, has not been met. Morton claims that at the time she allegedly promised to correct any insurance policies that still listed her as a beneficiary, she was unaware of the policy at issue. Thus, Morton states that she could not have known the statements were false when made. Morton testified, however, that she knew of the insurance policy that preceded the Maccabees policy. She knew that the policy was for $100,000 and knew that she was the beneficiary. Moreover, Morton also testified that she called Maccabees and the prior insurance company two days after Charles Morton's funeral in order to determine who the beneficiary was. Based on this testimony, a reasonable jury could have concluded that Morton's statements were false when made.
 
 
 30
 Morton also asserts that the fifth element above, proximate cause, has not been met. She claims that because an emergency guardianship may not have been possible, her representations could not have been the proximate cause of Roberts's loss. As we discussed in Part IV, there was sufficient evidence for a reasonable jury to conclude that an emergency guardianship possibly could have been obtained and that it could have resulted in a change of the beneficiary. We therefore reject Morton's argument that JNOV or a new trial was proper with regard to the fraud and misrepresentation claim.
 
 VI. Conclusion
 
 31
 As discussed above, in order to affirm the district court's denial of Morton's alternative motions for JNOV or a new trial, we must affirm all of the theories upon which the jury could have based its decision. Because we hold that the issue of whether Morton assigned to Charles Morton her rights to the proceeds of the IRA and the life insurance policy by entering the separation agreement should not have gone to the jury, we VACATE the district court's denial of appellant's alternative motions and REMAND the case for a new trial.
 
 
 32
 VACATED and REMANDED.
 
 CLARK, Senior Circuit Judge, dissenting:
 
 33
 I agree with the majority's conclusion that appellant Julie Dianne Morton did not assign her rights in the life insurance policy and the IRA account to Charles Morton and his estate. I disagree with the majority's holding that the evidence supported appellee Josephine Morton Roberts' related promissory estoppel and fraud claims. Appellee failed to prove any possible injury by a preponderance of the evidence, and the district court accordingly should have granted appellant's motions for directed verdict or judgment non obstante veredicto. I respectfully dissent.
 
 
 34
 Underlying both the promissory estoppel and the fraud claims are appellee's allegations that she immediately would have sought to be appointed Charles Morton's guardian and would have changed the beneficiary on the life insurance policy and the IRA account prior to his death[1] but for appellant's purported promises to turn over the life insurance proceeds to appellee.[2] Support for these allegations in the record is crucial to the majority's holding that a reasonable jury could have found for appellee on the promissory estoppel and fraud claims. Regardless of appellant's alleged promises, if appellee did not show that she could have been appointed guardian and changed the beneficiary, appellee would have suffered no detriment to support her promissory estoppel claim and appellee would not have established the requisite proximate causation to support her fraud claim. And neither the evidence introduced at trial nor the law given to the jury showed that appellee could have been appointed guardian and changed the beneficiary before Charles Morton's death. As the district court remarked, appellee "probably couldn't have done it [changed the beneficiary]."[3]
 
 
 35
 The only testimony on the guardianship issue came from a probate court judge, called by appellant. The probate court judge testified that two kinds of guardians may be appointed under Georgia law for incompetent adults: permanent and emergency guardians. She stated that she had appointed many permanent guardians in thirteen years on the bench; that she had been requested to appoint only a few emergency guardians; but that she had never encountered circumstances justifying the appointment of an emergency guardian.[4] The probate court judge further testified that she had never appointed a permanent guardian in less than a month and a half.[5] At most, twenty-eight days intervened between appellant's alleged promises and Charles Morton's death.[6] On these facts, no rational jury could have found, and the majority does not now contend, that appellee could have been appointed a permanent guardian in this time period. Appellee was therefore required to show that she could have been appointed an emergency guardian.
 
 
 36
 The probate court judge testified that an emergency guardian could be appointed in three to five days.[7] There are only two conditions justifying the appointment of an emergency guardian in Georgia: preservation of life or preservation of an estate.[8] The probate court judge never stated that an emergency guardian could have been appointed under the circumstances of this case. She only gave the obvious answer that an emergency guardianship could be created, assuming that the statutory requirements were met (that the emergency guardianship was necessary for the preservation of life or an estate).[9] More importantly, the probate court judge stated in response to a cross-examination question from appellee's attorney that she would not have considered the mere fact that some event was going to diminish a proposed ward's estate in deciding whether to appoint an emergency guardian:
 
 
 37
 Q. All right. Assuming that ... any events were taking place, whether or not [the proposed ward] was doing something, if there was any action ... that was going to dissipate his estate and make him insolvent, ... would you have been able to take any action? Would you have considered that?
 
 
 38
 A. No. What you consider is what the patient is going to do at that point.[10]
 
 
 39
 Understandably, appellee's attorney immediately moved to a different line of questioning after this response.
 
 
 40
 Less understandable is the majority's conclusion that appellee sufficiently supported her assertion that she could have been appointed an emergency guardian. The unavoidable import of the probate court judge's above-quoted statement is that it would be irrelevant to the appointment of an emergency guardian that Charles Morton's life insurance policy and IRA account named someone other than his proposed guardian as the beneficiary. The judge's testimony was that the incompetent's current actions have to support the creation of an emergency guardianship to preserve an estate.[11] In other words, obligations undertaken prior to the period of incompetency having the incidental effect of diminishing the incompetent's estate do not by themselves justify an emergency guardianship. Appellee has asserted no other grounds for seeking an emergency guardianship. According to the trial testimony, appellee therefore was not injured by appellant's alleged promises, because appellee would not have been able to obtain an emergency guardianship.
 
 
 41
 In the face of appellee's failure to carry her burden of proof at trial, the majority relies on the Georgia statute governing the appointment of emergency guardians[12] to hold that appellee could have been appointed an emergency guardian.[13] The majority omits to disclose that this statute was never even mentioned to the jury.[14] The district court judge--the jury's exclusive source of law[15]--did not refer to the statute or describe the standards for appointment of guardians in his jury charge.[16] The trial transcript reveals no discussion of the statute or the standards it sets out. As claimant, appellee was required to establish every material element of her case. However, appellee failed to bring the statute relied upon by the majority to the attention of the jury. In the absence of this information, the jury would have had no basis for finding in appellee's favor on the promissory estoppel and fraud counts. In effect, appellant introduced expert legal testimony as to the interpretation of the statute at issue. Appellee simply never managed to counter this testimony with expert witnesses of her own or otherwise. The majority thus takes an approach to the record that verges on the metaphysical: The majority concludes that the jury innately would have known of the existence of section 29-5-8(b) and then would have interpreted its provisions in direct contradiction to the only testimony presented on this issue, that of the probate court judge. This process of reasoning eludes me.
 
 
 42
 The majority further argues that appellee in fact met the statutory requirements for the appointment of an emergency guardian and that appellee did not have to disprove the probate court judge's testimony that she personally would not have appointed an emergency guardian under the circumstances of this case.[17] Even assuming that there is a convergence between appellee's claims and the law of Georgia, this happenstance does not establish that appellee introduced sufficient legal support for her claims during these particular proceedings. And I find no basis in the record for the majority's assertion that the probate court judge's testimony only amounted to a declaration that she would not have appointed a guardian under the postulated circumstances. The judge gave expert testimony as to the procedures followed generally in the Georgia probate courts, and neither she nor the attorneys ever indicated that she was merely representing her own idiosyncratic responses to the various factual situations presented to her.
 
 
 43
 Notwithstanding the majority's ex post facto insertion of the Georgia emergency guardian statute into the record, appellee failed to introduce even a "mere scintilla of evidence"[18] at trial that she could have been appointed a guardian under the circumstances of Charles Morton's incompetence. Due to this failure of proof, appellee did not show that she sustained any injury to support her promissory estoppel and fraud claims. The district court was obligated to grant appellant's motions for directed verdict or judgment notwithstanding the verdict. I would reverse for entry of judgment in favor of appellant.
 
 
 
 [1]
 Based on other testimony of the probate judge, the dissent argues that Roberts could not have obtained an emergency guardianship. On cross-examination, the probate judge was asked whether she would consider, in appointing an emergency guardian, the fact that events were occurring that could dissipate a proposed ward's estate even though the ward was not acting to cause the dissipation. She said: "No. What you consider is what the patient is going to do at that point." R4-73. From this the dissent concludes that only current actions by the incompetent can give rise to an emergency guardianship, and therefore Roberts did not meet her burden of proving that it was possible to attain the guardianship
 We see nothing in the statute to indicate that an incompetent's inability to exercise a right to change an inadvertent beneficiary on a large asset of the estate immediately prior to impending death would not be sufficient to trigger the appointment of an emergency guardian. Roberts was required to prove that it was possible to attain an emergency guardianship. The statute allows the appointment of an emergency guardian in order to prevent dissipation of the estate. Roberts proved that there was sufficient time to attain the guardianship, that a large asset of the estate was likely to be lost if a guardian was not appointed, and that she would have attempted to attain the guardianship if she had not relied on Morton's promise. She was not required to disprove the testimony of a probate judge called by Morton that that particular judge would not have appointed an emergency guardian under hypothetical circumstances posed by a cross-examiner.
 
 
 [1]
 The life insurance contract provided that the owner of the contract could change the beneficiary at any time while the insured was alive
 
 
 [2]
 See R3-93-94 (testimony of appellee) ("[Appellant] and my daughter were there and I said that I needed--I needed to get myself appointed Charlie's guardian because I did not know how long Charlie was going to be incapacitated, and I was all that he had, and I knew that things might come up. And [appellant] said, 'You don't need to worry Charlie at this time,' said, 'If you go in there and do that,' says, 'Charlie will think he's dying and we don't want him to think he's dying.' And she said, 'Mrs. Roberts, I've told you I have no interest in the insurance other than to make sure that the beneficiary comes to his family, because I know that this was what Charlie would want and I want to carry out his last wishes.' ")
 
 
 [3]
 R4-135
 
 
 [4]
 R4-62; R4-73-74
 
 
 [5]
 R4-64
 
 
 [6]
 See R3-90 (appellee's testimony that appellant made promises to her on September 17, 1987). Charles Morton died on October 15, 1987. R3-11. I note that the actual period of time appellee had to obtain a guardianship and change the beneficiary was probably much less than twenty-eight days. Appellee testified that she first discovered the existence of the insurance policy at issue during the last week of September. R3-93. She would have had no reason to seek a change in the beneficiary prior to this time and accordingly would have had only two to three weeks in which to seek guardian status. Moreover, the conversation during which appellee alleges appellant specifically promised to make sure that appellee received the insurance proceeds at issue did not occur until October 3 or 4, 1987, leaving even less time to seek guardian status. R3-114
 
 
 [7]
 R4-63
 
 
 [8]
 Id.; see also Ga.Code Ann. § 29-5-8(b) (petitions for appointment of emergency guardians shall set forth "(1) Such facts as establish an immediate, clear, and substantial risk of death or serious physical injury, illness, or disease unless an emergency guardian is appointed; or (2) Such facts as establish an immediate, substantial risk of irreparable waste or dissipation of the estate of the proposed ward unless an emergency guardian is appointed.")
 
 
 [9]
 See R4-72:
 Q. Assume also that it was either for the preservation of life or the preservation of the ward's estate?
 A. Okay. If surgery was pending or he was about to sign a deed or something of this nature, those two things would have to exist.
 
 
 [10]
 R4-72-73 (emphasis added)
 
 
 [11]
 See also R4-63 (probate court judge testifies as to when an emergency guardianship is appropriate to preserve an estate: "An example would be [the incompetent] has an estate of maybe a $150,000.00 house. Someone has offered him $10,000.00, and he is about to close that deal.")
 
 
 [12]
 Ga.Code Ann. § 29-5-8(b)
 
 
 [13]
 Majority opinion, at 12-13
 
 
 [14]
 In fact, this statute was not even cited in the parties' briefs on appeal
 
 
 [15]
 See Central of Ga. R.R. v. Sellers, 129 Ga.App. 811, 201 S.E.2d 485, 488 (1973) ("In all civil cases the jury shall receive the law exclusively from the trial judge and any departure from this rule will constitute reversible error." (emphasis in original)); see also R5-5 (district court's jury charge: "The law as contained in these instructions represents the only law for your guidance....")
 
 
 [16]
 Nor did appellee object to the district court's charge to the jury on these grounds. See R5-32-34
 
 
 [17]
 See majority opinion, at 1186 n. 1
 
 
 [18]
 Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc) ("On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.... A mere scintilla of evidence is insufficient to present a question for the jury.")