### Cheryl N. WILLIAMS,

### v.

### MARRIOTT CORPORATION d/b/a Marriott's Marco Island Resort and Golf Club, Defendant.

### No. 93–34–CIV–FTM–21D.

United States District Court, M.D. Florida.

Aug. 26, 1994.

---

Hilary Goodman, Carlson, Bales and Schwed, Miami, FL, for plaintiff.

Albert W. Miller, Law Office of Donald C. Anderson, St. Petersburg, FL, Julienne W. Bramesco, Carlton J. Trosclair, Marriott Corp. Law Dept., Bethesda, MD, for defendant.

## ORDER

GAGLIARDI, Senior District Judge.

Defendant moves for judgment as a matter of law and a new trial pursuant to Federal Rule of Civil Procedure 50(b). Defendant was found liable by a jury for two counts of violation of Plaintiff's right to be free from gender discrimination under 42 U.S.C. § 2000e. The jury awarded $150,900 compensatory damages on each count and an additional $100,000 in punitive damages. Defendant argues that it is entitled to judgment as a matter of law because Plaintiff failed to provide evidence from which a reasonable jury could conclude that she was discriminated against on the basis of her gender. Defendant argues that it is entitled to a new trial because: the great weight of the evidence as to both counts was against the verdict; the misconduct of Plaintiff's counsel impaired the jury's ability to deliberate; and improper communications were made to a juror. Defendant failed to renew its motion for judgment as a matter of law on the issue of punitive damages, therefore, that issue will not be considered by the Court. For the reasons that follow, the motions are denied and the judgment is reduced to $250,900.

## I. BACKGROUND

Plaintiff Cheryl Williams ("Williams") is 45 years old. She was hired by Defendant Marriott Corporation ("Marriott") as a loss prevention officer at its Marco Island Resort in August, 1986. She was the only female in the department which consisted of five to seven people. The department in which she worked was responsible for the resort's security. Williams had a background in security. She was promoted to supervisor in March of 1988 and made temporary department head in July, 1991 until the arrival of the new department head, Robert Waller, in August, 1991. She received a number of awards based on her performance and received the highest performance ratings in all of her reviews prior to Waller's arrival.

Williams testified that within days of Waller's installment as department head, he had told Williams that he was disappointed in her performance, that she was not the supervisor that he thought she was, and that she had communication and attitude problems. Waller continually criticized Williams's work and refused to explain to her in what ways it was deficient or how he wanted it done. Virtually every "incident report" that she filed was rejected by Waller, while most of the reports submitted by other employees were accepted. She testified that he enlisted her to help him force two male employees in the department to quit by modifying their schedules. He later began unilaterally modifying her schedule as well.

Williams testified that Waller gave her until Thanksgiving "to make it happen," that is, for her to bring her performance up to his standard. When asked what it would take to do so, however, he refused to specify what he meant or how she could improve. On November 7 Waller gave her an outline upon which Williams was to draw up "plans and actions" pursuant to her improvement. The outline did not mention any of the previous criticisms made of her by Waller, such as communications problems. She submitted four drafts of such a plan, but each was rejected by Waller as deficient. On November 13 she was written up for using profanity by Waller based on accusations of fellow department employee Tom O'Neil. Williams testified that she had not used profanity, while O'Neil had and that she told Waller this.

On November 15 Williams was written up by Waller for improperly adjusting her time sheets. She testified that she had the authority to do so and that Tom O'Neil did the same thing without being written up. Around this time, Williams wrote a letter to J.W. Marriott, the head of Marriott, com-

plaining of the treatment that she was receiving. As a result, she was told that she could transfer from the department or quit. In late December, Waller told her that she was incapable of writing her own "plans and actions" outline, and that he would, therefore, prepare one for her. It consisted of reading books and preparing book reports, among other things, and Williams testified that none of the other members of the department had to do such things and that she felt demeaned by it.

On December 24, 1991 she was called to one of the resort's restaurants where a patron had been cut. The restaurant manager, who, Williams testified, had greater authority than Waller, instructed her merely to get a band-aid and not to write up an "incident report." Waller nevertheless wrote her up for failing to do so though he confirmed with the restaurant manager that he had instructed her to do so. Williams then wrote a letter to Waller asking him to answer specific questions about her deteriorating situation. He responded that she should answer them herself. Further similar incidents followed wherein Williams characterized her actions as proper but she nevertheless received written warnings. In March, 1992 she was informed that she had been placed on probation and demoted. Two men were promoted into her position. After further similar incidents and a poor review by Waller, Williams filed a complaint in June, 1992 with the Equal Opportunity Employment Commission.

In September, 1992 Williams made an appointment with a physician because of her discovery of a lump in her breast. She made the appointment on September 10, the same day she was to be seen. She went to work and attempted to find Waller and others in the department in order to inform them that she would have to leave for the appointment. She could not locate them so she followed proper procedures for logging out. When Waller became aware that she had left, he fired her.

## II. DISCUSSION

### A. Judgment as a Matter of Law

■ Judgment as a matter of law will be granted if "there is no legally sufficient evi-

dentiary basis for a reasonable jury to have found" for a party. Fed.R.Civ.P. 50(a). The motion should be granted where there can be but one reasonable conclusion as to the verdict. *Maccabees Mutual Life Ins. Co. v. Morton*, 941 F.2d 1181, 1184 (11th Cir.1991). When considering such a motion, a court must view all the evidence in the light most favorable to the non-moving party. *Id.* Where substantial conflicting evidence is presented such that reasonable people in the exercise of impartial judgment might reach different conclusions, the motion should be denied. *Id.*

The motion as to the first count alleging discriminatory employment decisions does not merit discussion. The motion as to the second count, alleging a hostile work environment, is more difficult because Plaintiff presented no evidence that she was exposed to an environment which included overtly sex- or gender-based acts or words.

■ In order to make out a hostile work environment claim, a plaintiff must prove the following five elements: 1) that plaintiff is a member of a protected group, 2) that she was subjected to unwelcome sexual harassment, 3) the harassment was based upon gender, 4) that the harassment affected a term, condition, or privilege of employment and 5) that her employer knew or should have known of the treatment and failed to take prompt remedial action. *Bell v. Crackin Good Bakers*, 777 F.2d 1497, 1502 (11th Cir.1985).

■ Plaintiff introduced evidence from which a reasonable jury could conclude that 1) she was a woman, 2) that she was harassed, 3) that the harassment was based upon gender, 4) that it affected a term, condition or privilege of her employment and 5) that Defendant knew but did not take prompt remedial action. As to element number 2, however, it is not clear that the harassment she was subjected to was "sexual." The proof at trial of Waller's treatment of Williams indicated that it did not consist to any extent of acts or words of a sexual nature, either overtly or covertly.

To make out a hostile work environment claim, however, one need not show that the environment was hostile in a sexual manner, but merely that it was hostile because of the plaintiff's gender. *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990); *Hall v. Gus Const. Co.*, 842 F.2d 1010 (8th Cir.1988); *Hicks v. Gates Rubber*, 833 F.2d 1406 (10th Cir.1987); *McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985) ("We have never held that sexual harassment or other unequal treatment of an employee ... that occurs because of the sex of an employee must, to be illegal under Title VII, take the form of sexual advances or of other incidents with clearly sexual overtones.... Rather, we hold that any harassment or other unequal treatment of an employee ... that would not occur but for the sex of the employee ... may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII."); *see Bell*, 777 F.2d at 1503.

In *Bell*, the court stated that sexual harassment includes "threatening, bellicose, demeaning, hostile or offensive conduct in the workplace because of the sex of the victim of such conduct...." *Id.* at 1503. The fact, therefore, that the treatment to which Waller subjected Williams was completely gender-neutral, is irrelevant, as long as their was sufficient evidence for a reasonable juror to conclude that it was motivated by gender. *Bell*, 777 F.2d at 1503. There was ample evidence presented at trial from which the jury could reasonably have concluded both that the environment that Williams faced was hostile and that that hostility was due to her gender.

## B. New Trial

### 1. The Weight of the Evidence

In order to grant a new trial based on the nature of the evidence, a court must conclude that the verdict is against the great, not the greater, weight of the evidence. *Redd v. Phenix City*, 934 F.2d 1211, 1214 (11th Cir.1991). "The district court should not substitute its own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." *Id.* at 1215. Therefore, "[w]hen there is

some support for a jury's verdict, it is irrelevant what we or the district judge would have concluded." *Id.* There was adequate support in the evidence presented to the jury to support their verdicts on the two counts.

### 2. Misconduct of Counsel

On two occasions, counsel for Plaintiff asked witnesses questions regarding a polygraph examination. Objections by Defendant were sustained in both instances. Prior to the second occasion, the Court had heard argument from Plaintiff regarding the admissibility of the evidence and had ruled that it was not admissible and directed counsel to avoid the subject. Nevertheless, counsel, in cross-examining Robert Waller asked: "Q: Now, theft is the number one reason somebody can be immediately terminated, right? A: That's correct. Q: Why didn't you take polygraph exams? A: We don't polygraph in our company. Q: Do you know that Tom O'Neil—" (Trial Transcript at p. 621). At this point the Court interrupted and directed counsel to refrain from going into the subject.

"The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was such as to impair gravely the calm and dispassionate consideration of the case by the jury." *BankAtlantic v. Blythe Eastman Paine Webber*, 955 F.2d 1467 (11th Cir.1992). In *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir.1990), the court held that the trial court did not abuse its discretion in granting a new trial where counsel argued a theory of liability in closing that it had abandoned prior to trial, referred to a specific exhibit in support of that theory which was not in evidence and had the exhibit sent back to the jury. In *Sorenson v. Raymond*, 532 F.2d 496 (5th Cir.1976), the court held that the trial court did not abuse its discretion in refusing to grant a new trial where counsel disobeyed a court order not to ask the plaintiff whether he had used drugs in an action under § 1983 claiming that plaintiff was evicted on the basis of the race of his guests because the testimony elicited was not damaging. *Id.*

Plaintiff's counsel's behavior was inexcusable in light of the extended discussion that was had on the subject of polygraphs and the clear direction by the Court that it be avoided. The Court does not believe, however, that the evidence and questions about the polygraphs to which the jury was exposed was serious enough to call into question the jury's verdict. Of the three references to a polygraph that the jury heard, two were in the form of questions of counsel, and the final was merely Waller's assertion that Marriott did not use polygraphs. This is not enough to destroy a jury's ability to deliberate dispassionately.

### 3. Jury Tampering

On Thursday, February 10, a jury of seven began deliberations in this case. Their deliberations continued through Friday. On Monday morning, February 14, a note was forwarded to the Court from the jury foreperson stating: "Your Honor, please, Miss Caroline O'Neill, juror number 4, has been compromised (possibly). P.S. She would like to talk to you."

An interview was held in chambers with Juror O'Neill at which counsel was present. O'Neill indicated that she was extremely upset because someone had made a statement to her on Friday morning that was "telling me I should think one way, when I think another way." (Trial Transcript at 785). She would not identify the person who made the statement further than to say that it was made by someone in the courthouse. She further indicated that she had attempted to disregard the statement, but could not do so. The attorneys then offered to step out, and the Court interviewed her in private. In private, O'Neill reiterated how upset she was and indicated that the matter had "tortured" her and "drove [her] crazy" all weekend. The Court suggested that she be excused, and O'Neill agreed that that would be her desire.

The attorneys then returned and the Court announced that Juror O'Neill would be excused. O'Neill was then excused and left chambers. The Court informed counsel that in their absence O'Neill had merely reiterated her anxiety and had neither indicated

what was said or by whom it was said. Neither party objected to the Court's excusal of Ms. O'Neill.

Upon motion by Defendant after trial, Ms. O'Neill was re-interviewed. At that time she indicated that a member of the court staff had said to her as she entered the building on Friday morning: "Don't be too hard on that little lady in there today." (Transcript of 3/10/94 hearing). O'Neill also indicated that she had not told any of the other members of the jury what had been said or by whom it had been said. Rather, she indicated that she had told them only that somebody had said something to her.

■ Absent exceptional circumstances which call into question the integrity of a trial, a party waives any objection to a court's response to juror misconduct unless it makes a timely objection. *Bank of the South v. Fort Lauderdale Tech. Col., Inc.,* 48 F.R.D. 136 (E.D.La.1969) (affirmed by, and reasoning adopted in *Bank of the South v. Fort Lauderdale Tech. Col., Inc.,* 425 F.2d 1374 (5th Cir.1970)); *Garcia v. Murphy Pac. Marine Salvaging Co.,* 476 F.2d 303, 306 (5th Cir.1973) (dicta) ("Of course, a party, with knowledge of a juror's misconduct, must make a timely objection and is not permitted to take his chances on a favorable verdict and if unfavorable get a second bite at the apple."); *Cooper v. Dyke,* 814 F.2d 941 (4th Cir.1987); *see United States v. Bolinger,* 837 F.2d 436 (11th Cir.1988) (objection waived where criminal defendant became aware that juror had discussed case with third party and expressed an opinion as to defendant's guilt during recess in deliberations, but did not bring it to court's attention until post-trial motion).

In *Bank of the South,* the corporate defendant's representative was observed "flirting" with a number of female jurors by winking and making other facial expressions at them while in the jury box. *Bank of the South,* 48 F.R.D. at 136–37. This fact was brought to the plaintiff's attention on two occasions. The plaintiff chose not to make a motion for a new trial on either occasion. On a third occasion, the plaintiff observed a male juror winking at the defendant's representative.

The juror apparently believed that a wink intended for a female juror was aimed at him and returned the gesture. *Id.* at 137.

The plaintiff did not bring this final incident to the court's attention until it made a post-trial motion for a new trial. The court held that a party cannot be allowed to speculate on the effect of jury misconduct and that "[t]he moving party's own contemporaneous estimate of the prejudicial value of courtroom conduct is a significant factor in the court's subsequent appraisal of the degree to which the overall proceedings may have departed from the strictest standards of justice." *Id.* at 137. It noted that the plaintiff had full knowledge of the incidents and chose to take its chances with the jury. The court characterized the motion as an "attempt[ ] to avoid the consequences of [the plaintiff's] failure to object by suggesting that he did not properly appraise the amount of prejudice that would result. This means only that [the plaintiff] thought he would win and didn't." *Id.* at 138.

In *Dawson v. Wal–Mart Stores,* 781 F.Supp. 1166 (N.D.Miss.1992), counsel was aware that three jurors knew opposing counsel and of the nature of their relationships but did not exercise peremptory challenges to remove any of the jurors or challenge any of the jurors for cause. The court, therefore, denied a motion for a new trial on the basis of juror prejudice. In reaching its decision, the court stated that "[c]ounsel cannot now complain in hindsight of tactical decisions made with full knowledge of the facts." *Id.* at 1172.

In *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.,* 661 F.Supp. 1448 (D.Wyo.1987), a juror wrote a poem and passed it to the court's law clerk. The judge provided copies of the poem to counsel who did not make any response. The court denied a post-trial motion for a new trial on the basis of the juror's prejudice because it held that the party had waived its right to raise the issue. A similar result was reached in *General Motors Corp. v. Walden,* 406 F.2d 606 (10th Cir.1969), when a party moved for a new trial on the basis of the court's response to a note from the jury. The note indicated that they were split 5–1; the court

responded that they should continue deliberating. *Id.* at 609. The court found that the ground had been waived because the party had failed to object at the time that it was informed of the note and the court's response. *Id.* at 610.

In this case, Marriott moved for a new trial based on the incident with O'Neill in its supplemental motion filed after the Court re-interviewed O'Neill. Marriott failed to so move at the time the Court decided to excuse O'Neill and it again failed to do so in its first post-trial motion for new trial, although it did move at that time to interview O'Neill to determine what was said to her. Marriott states in its supplemental motion that it is entitled to a new trial because O'Neill's ability to deliberate was compromised. Marriott was fully aware of this fact, however, at the time that the Court excused her and failed to object.

Marriott was present for part of the interview with Juror O'Neill. The Court informed Marriott of the substance of the portion of the interview conducted without Marriott present. Marriott claims that it is entitled to a new trial on the basis of the following facts: that a comment was made to O'Neill by a court official; that she was extremely distressed by it; that she had told her fellow jurors that something had been said to her, but not what or by whom; that O'Neill did not feel that she could continue to deliberate; that deliberations were to be recessed shortly after the removal of O'Neill so that another juror could attend a funeral; and that the jury reached its verdict less than an hour after O'Neill was excused.

Of these facts, only three were not known to Marriott at the time that the Court announced its decision to remove O'Neill. The first two are the nature and the origin of the comment. These facts, however, are merely cumulative of what Marriott knew at the time of O'Neill's removal. While the comment and the fact that a member of the court staff made it are disturbing, and confirm that a serious breach of court procedure occurred, they are not relevant to anything other than O'Neill's ability to be impartial. Marriott knew that she had been compromised at the time that the Court decided to remove her,

however. The significance of the specific nature of the contact with O'Neill was made moot by her removal.

The only remaining fact of which Marriott was ignorant at the time that O'Neill was removed was the length of time that the jury would take to reach a verdict and the result it would reach. No party, however, has the benefit of this information during trial when it is called upon to decide whether or not to object to decisions of the Court. Thus, this is not a basis upon which a party should be excused from failing to raise a motion when its grounds are otherwise apparent.

Marriott was fully informed of all of the facts bearing on the ability of the jurors who rendered the verdict to do so impartially. Marriott did not request that the Court conduct further interviews at the time that O'Neill was removed nor did it object to the Court's decision to remove O'Neill and have the remaining jurors proceed. To the extent that the "process" of reaching a verdict in this case was affected by outside influence, as it surely was, Marriott was fully informed of the effect of that influence and assessed its potential impact. It did so, and chose to remain silent. Because Marriott failed to make a timely objection, it waived its right to raise this issue in a motion for a new trial.

C. Duplicative Award

■ A plaintiff cannot recover twice for the same injury. *E.g. Finch v. City of Vernon,* 877 F.2d 1497 (11th Cir.1989). In *Finch,* a 42 U.S.C. § 1983 case, the court held that the trial court was correct in reducing the damage award where damages had been awarded for both a claim of a violation of federal rights resulting from a retaliatory discharge and a state law claim of wrongful termination. The court noted that the jury had been thoroughly instructed on avoiding double damages, but nevertheless found that "[i]t was clear ... that the damages awarded on [plaintiff's] claim for retaliatory discharge included damages for wrongful discharge." *Id.* at 1506.

In this case, the jury was not instructed on the issue of duplicative damage awards. In fact, the verdict form invited duplication because each of the two causes of action had its own identical damages section, and it did not contain a warning about duplication.

In examining the verdict form, the awards on each count are identical. This is particularly significant because the form had a line for medical damages. There was evidence in the case about Williams's medical damages. Plaintiff's counsel, in closing, suggested a figure of $842.05. The jury awarded $900 for each claim. There was absolutely no evidence that plaintiff suffered separate medical injury from each of the claims—wrongful termination and hostile work environment. Nor was there any evidence to suggest that Plaintiff suffered separate economic or emotional harm from the two wrongs. The injury in this case was identical, but had two legal causes. Plaintiff is not entitled to recover twice, but only to be made whole. Therefore, the proper amount of damages to which Williams is entitled based on the jury's verdict is $250,900—$150,900 in compensatory damages and $100,000 punitive damages.

### III. CONCLUSION

Defendant's motions for judgment as a matter of law and for a new trial are denied. Plaintiff is entitled to judgment in the amount of $250,900. Let the clerk enter judgment accordingly.

So Ordered.